**George T. Holler**
Holler Law Firm, LLC
31 Cherry Street, Suite 109
Milford, CT 06460
t:  (203) 301-4333
f:  (203) 306-3113
CT 27371
georgeh@hollerlawfirm.com

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**
**COURT FILE NO.: CV-11-687**

| | | |
|---|---|---|
| **Sean Michael O'Reilly** | ) | **COMPLAINT** |
| **Kelly Ann O'Reilly** | ) | |
| | ) | |
| **Plaintiffs.** | ) | **JURY TRIAL DEMANDED** |
| _____ | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **New Hampshire/Northeast** | ) | |
| **Credit Services, Inc.,** | ) | |
| **Donna Rose** | ) | |
| **Defendants.** | ) | |

**JURISDICTION**

1.  Jurisdiction is conferred on this Court pursuant to the provisions of 28 U.S.C. §
    1331 and pursuant to 15 U.S.C. §1692k(d) and pursuant to 28 U.S.C. § 1367
    for pendent state law claims.

2.  This action arises out of Defendants' violations of the Fair Debt Collection Practices
    Act, 15 U.S.C. §1692 *et seq*. ("FDCPA"), violations of the Connecticut Unfair
    Trade Practices Act, 36a C.G.S. §110 *et seq* and out of the invasions of
    Plaintiffs' personal and financial privacy by these Defendants and their agents in
    their illegal efforts to collect a consumer debt from the Plaintiffs.

3.  Venue lies in this District because the acts and transactions occurred here,

Plaintiffs reside here, and Defendants transact business here.

## PARTIES

4.  Plaintiff, Sean Michael O'Reilly (Plaintiff) is a resident of the full age of

majority, domiciled in the Town of Orange, County of New Haven, and State

of Connecticut and is a consumer as that term is defined by 15 U.S.C.

§1692a(3), a "consumer debtor" as that term is defined by 36a C.G.S. §36a-

800(2), and a "person who suffer[ed] any ascertainable loss" under 42 C.G.S.

§110g.

5.  Plaintiff, Kelly Ann O'Reilly, (Plaintiff) is a resident of the full age of majority,

domiciled in the Town of Orange, County of New Haven, and State of

Connecticut and is person with standing to bring a claim under the FDCPA by

virtue of being directly affected by a violation of the Act and is a "person who

suffer[ed] any ascertainable loss" under 42 C.G.S. §110g.

6.  The defendant in this case, New Hampshire/Northeast Credit Services, Inc.

(hereinafter "Defendant" or "NH/NE"), is a corporation incorporated in the

State of New Hampshire, having a principal place of business at 41 Simon

Street, Suite 2A, Nashua, New Hampshire 03060, and is a "debt collector" as

that term is defined by 15 U.S.C. §1692a(6) and a "Consumer collection

agency" as that term is defined by 36a-C.G.S. §36a-800(1).

7.  The defendant in this case, Donna Rose, (hereinafter "Defendant" or "Rose") is a

natural person who was employed at all times relevant herein by Defendant

NH/NE and is a "debt collector" as that term is defined by 15 U.S.C. §1692a(6).

## FACTUAL ALLEGATIONS

8. In March 2009, the O'Reillys relocated from New Hampshire to Connecticut so that Sean could take a new job.

9. They were able to rent out the home they owned in New Hampshire for just enough money to cover the carrying cost on the property. Owing more than the amount due on the mortgage, they could not sell the home.

10. Kelly, a teacher, had expected that upon moving to Connecticut she would quickly find new work.

11. They had just recently been blessed with a healthy new baby boy.

12. Unfortunately Kelly was unable to secure employment and the burden of maintaining the home in New Hampshire, together with the cost of their new son caused their financial situation to deteriorate rapidly.

13. Within a few short months, the O'Reillys were feeling the effects of constant collection calls and letters.

14. By June of 2009 the stress of these collection contacts had created serious tension in their marriage.

15. Night after night dinner was interrupted by collection calls.

16. Kelly would let Sean handle the calls.

17. Sean was cool and collected on the phone with the debt collectors, but when he hung up, he would often take his frustration out on Kelly and their son.

18. Sean felt inadequate as a husband and father because he could not provide enough income for his family to free them from this constant harassment.

19. Sean would often withdraw from the family, isolating himself in front of the computer.

20. Both Sean and Kelly had taken to avoiding the phone, but when it rang it often triggered disputes between them—sometimes related to finances and sometimes other issues, but the collection calls provided the spark for the tinder box their marriage had become.

21. Their then 9-month-old son witnessed regular bickering between his parents over how to solve their debt problems.  Many of these discussions included ugly words, harsh tones and loud voices.

22. The O'Reillys suffered through many restless nights, often going to bed angry with each other due to the stress put on them by relentless debt collection activities.

23. Neither Sean nor Kelly wanted to file for bankruptcy.  Both felt ashamed and embarrassed that things had gotten so bad, and often blamed each other.

24. On or around July 23, 2009, the O'Reillys met with an attorney to discuss their financial situation and subsequently hired that attorney.

25. In spite of their feelings about the unseemliness of filing for bankruptcy, the O'Reillys decided that filing for Chapter 7 relief was their only way out of the nightmare their life had become.

26. Sometime before August 2009, Plaintiff incurred a financial obligation that was primarily for personal, family or household purposes and is therefore a "debt"

as that term is defined by 15 U.S.C. §1692a(5), namely, a bill for electrical services delivered by Public Service New Hampshire (hereinafter "PSNH") to the Plaintiffs' former residence at 180 Sanborn Street, Franklin, New Hampshire 03235.

27. Sometime thereafter, the debt was consigned, placed or otherwise transferred to the Defendant NH/NE for collection from these Plaintiffs.

28. Upon the filing of their bankruptcy petition, the O'Reillys felt relieved, believing that their financial troubles were over; they believed that they finally had a fresh start.

29. The petition was filed under Chapter 7 of the United States Bankruptcy Code on September 30, 2009 in the District of Connecticut, case number 09-32723.

30. The collection calls stopped and their marriage improved markedly.

31. The finger pointing was over, and both Sean and Kelly had the opportunity to enjoy quiet moments with their son.

32. They particularly enjoyed the fact that they could have dinner as a family without the phone ringing.

33. When the phone rang, they not longer felt dread, but instead felt excited anticipation wondering which of their family or friends was calling.

34. The O'Reillys listed the debt to PSNH on Schedule F and listed PSNH in the creditor mailing matrix in the bankruptcy case, copies of which are contained in the record of the underlying Chapter 7 case as docket number 1.

35. The Plaintiffs received a Chapter 7 discharge by Order of the Bankruptcy Court signed on January 5, 2010.

36. Under 11 U.S.C. §524, the discharge order entered by the Bankruptcy Court affected the legal status of this debt making the debt uncollectible.

37. Sometime after the discharge, the debt was consigned, placed or otherwise transferred to the Defendant NH/NE for collection from these Plaintiffs.

38. Under 36a C.G.S. §801, all "Consumer collection agencies" operating in the State of Connecticut are required to obtain a license from the Commissioner of Banking.

39. On information and belief, the Defendant NH/NE was a "Consumer collection agency" at the time all the actions complained of herein took place, and said Defendant did not have a license.

40. On or around June 15, 2010, Mr. O'Reilly received a letter from NH/NE which falsely stated that Mr. O'Reilly owed a debt to PSNH, illegally demanded payment for the debt, and provided that unless he disputed the validity of the debt within 30 days, that NH/NE would treat the debt as valid.

41. When he received this letter Mr. O'Reilly was both angry and perplexed.

42.  He showed it to Kelly and said "I got this fucking letter."

43. Their then 20-month old son was in the room at the time, and Kelly was shocked.

44. Sean never swore in front of their son, and he rarely used profanity at all.

45. Kelly could tell he was very upset.

46.  This letter made him recall the times when he was a young adult and he had been the subject of abusive debt collection practices.  It also made him vividly recall the constant collection calls that he had received prior to filing for bankruptcy.

47. These recollections made him feel despondent because he believed that in spite of his full compliance with all of the Bankruptcy Court requirements, he would still be harassed by his old creditors.

48. Mrs. O'Reilly was also very upset, feeling that they had done all they needed to do in order to discharge this debt and that this problem would never be fully resolved.

49. She also worried that this would bring more stress to their marriage.  Raising a young son was difficult enough, and the marriage had come a long way since the summer before.

50. She feared that these debt problems would push the marriage back to the brink of divorce.

51. The delivery of the letter mischaracterizing the status of the debt constituted a false and misleading representation in connection with an attempt to collect a debt in violation of the FDCPA, including but not limited to 15 U.S.C. §§ 1692e,  and 1692f.

52. The delivery of the letter mischaracterizing the status of the debt constituted unfair and deceptive conduct in connection with an attempt to collect a debt in violation of 36a C.G.S. §808 and the regulations promulgated thereunder.

53. The delivery of any communication by the Defendant NH/NE to the Plaintiff in an attempt to collect a debt constituted a violation of 36a C.G.S. §801 because Defendant was not a licensed "Consumer collection agency" at the time of the communication.

54. These violations of public policy as enunciated in 36a C.G.S. §801 and §808, constituted conduct prohibited by the Connecticut Unfair Trade Practices Act, 42 C.G.S. §110 *et seq*.

55. The delivery of this letter to the Plaintiff constituted an invasion of privacy by intrusion upon seclusion.

56. After his profane outburst, Sean went into the bedroom and contacted NH/NE via telephone.

57. He spoke with a person who identified herself as Donna Rose, the Defendant.

58. Ms. Rose was very rude to Mr. O'Reilly, and from her words and the tone of her voice he believed that she considered him to be a "deadbeat."  She was very condescending.

59. Mr. O'Reilly informed Ms. Rose that the debt was included in his bankruptcy schedules and that he had a copy of the bankruptcy filing.  He also told her she could contact his bankruptcy attorney, George T. Holler, or he could provide her with the bankruptcy case number.

60. She told him that she "had no interest in that information."

61. In this same conversation, Ms. Rose indicated that it was Mr. O'Reilly's responsibility to fax written proof to her that he did not owe the debt, and that the debt was included in his bankruptcy.

62. According to Ms. Rose, it was his responsibility because "anyone can just tell me that."

63. Mr. O'Reilly felt even more upset after this exchange and he felt helpless because it now seemed like the burden of fixing the problem was on him, and that no matter what he did this problem would never go away.

64. He was especially upset that he had to fax the information to NH/NE because he did not have access to a confidential fax.

65. At that point, Mr. O'Reilly gathered his records from his bankruptcy case.

66. Lacking access to a private fax machine, he was faced with the prospect of handing his personal information to a clerk at a place like Staples or Kinko's.

67. The decision to file bankruptcy had been very painful for the O'Reillys, causing feelings of embarrassment and shame.

68. In order to avoid the further embarrassment of handing his bankruptcy petition, schedules and discharge (as Ms. Rose required) to a clerk at Staples, Mr. O'Reilly decided to purchase a fax machine from Dell at a cost of approximately $100.00.

69. Furthermore, he had to pay for a fax telephone line through his Vonage account at a cost of approximately $10.00 per month plus a $10.00 start up fee.

70. Once he obtained the fax machine and fax line, Mr. O'Reilly faxed a copy of the required documents to NH/NE on June 30, 2010.

71. On the cover sheet he indicated that NH/NE should contact him with any questions.

72. The tone and substance of the communication from Defendant Rose towards Mr. O'Reilly constitutes harassment and abuse, was false and misleading and was

an unfair practice all in an attempt to collect a debt in violation of the FDCPA, including but not limited to 15 U.S.C. §§ 1692d,  1692e and 1692f.

73. The tone and substance of the communication from Defendant Rose towards Mr. O'Reilly constituted harassment and abuse, was false and misleading and was an unfair practice, all in an attempt to collect a debt in violation of 36a C.G.S. §808 and the regulations promulgated thereunder.

74. This violation of public policy as enunciated in 36a C.G.S. §808, constituted conduct prohibited by the Connecticut Unfair Trade Practices Act, 42 C.G.S. §110 *et seq*.

75. All the while Sean was concerned with his credit rating.

76. The O'Reillys were hopeful that they would be able to purchase a house in January 2011 (a year after their bankruptcy discharge).

77. Sometime in August 2010, Mr. O'Reilly decided to request a copy of his credit report from Experian.

78. To be sure that there was no other collection activity, Mr. O'Reilly agreed to pay for credit monitoring from Experian at a cost of $15.00 per month.

79. When he received his credit report from Experian he saw that NH/ NE had placed a collection account on his credit report with an open date of May 2010, which was last reported July 2010.

80. This open date corresponded with the time that he was forced to incur a higher interest rate on a car loan he took out in May 2010.

81. Prior to purchasing the car in May, 2010, Mr. O'Reilly had obtained an approval for a car loan at an interest rate of 13.50% in March 2010.

82. The O'Reillys had chosen not to purchase a car in March 2010.

83. When they did purchase a car in May, 2010, they were forced to pay 14.75%
   interest on their car loan.

84. After seeing the collection account on his credit report Mr. O'Reilly believed that
   this had caused his credit score to drop and therefore forced him to incur the
   higher interest rate in May than the rate he had been quoted in March.

85. The belief that this inaccurate credit reporting had cost them a higher interest rate
   caused both Mr. and Mrs. O'Reilly to feel helpless because it seemed as if
   they had not really gotten a fresh start from their bankruptcy.

86. Mr. O'Reilly decided to file a dispute with Experian over this collection account.

87. On information and belief, Experian contacted NH/NE, as furnisher of the
   information, and received a response from NH/NE indicating that the
   information they had previously provided was correct.

88. On or around September 21, 2010, Mr. O'Reilly received a copy of his credit
   report from Experian which indicated that after investigating this dispute
   Experian determined that the collection account would remain on his credit
   report.

89. Upon receiving the results of the credit dispute, Mr. and Mrs. O'Reilly were
   extremely frustrated.  It seemed that they had followed all the rules, from
   fulfilling the bankruptcy requirements to following the proper procedures
   under the Fair Credit Reporting Act, but nevertheless this collection would not
   go away.  They felt they would never get out from under this debt.

90. On information and belief the placing of this collection account on Mr. O'Reilly's credit report resulted in a drop of 75-85 points in his credit score.

91. On information and belief, per the Fair Isaac Corporation, the company which produces the credit reporting industry standard "FICO" score, the reduction in credit score of 75 points can increase the interest rate on an auto loan from anywhere between 1.369% to 10.141%.

92. On information and belief, the reduction in credit score of 75 points can increase the rate on a thirty year mortgage from anywhere between .222% to 1.37%, and credit scores under 620 will likely not qualify for a mortgage at all.

93. In November of 2010, Mrs. O'Reilly contacted Scott Dana at NE Moves Mortgage in Milford, Connecticut, and inquired about obtaining a mortgage to purchase a home.

94. Mr. Dana told her that the O'Reillys needed to be at least one year out of bankruptcy and that Mr. O'Reilly's credit score had to be at least 620 to qualify for the mortgage.

95. He told her that they demonstrated sufficient income to qualify and that the money they had saved up would make an adequate down payment.

96. Mrs. O'Reilly provided Mr. Dana with Mr. O'Reilly's credit score and Mr. Dana told her that based on that score, they did not qualify for a mortgage.

97. Mr. Dana indicated that Sean's credit score was about 5 points less than it needed to be, and that he should pay off the NH/NE collection in order to remove the collection account.

98. Mr. Dana told Kelly that if Sean paid off the debt, he could get a credit update which would improve the credit enough to allow the O'Reillys to qualify for the mortgage and buy a home.

99. Upon learning that Mr. O'Reilly's score was too low, Sean and Kelly became very upset.  They were angry that this collection account had cost them their chance at buying a home.

100.    In January 2011, Mr. Dana obtained Mrs. O'Reilly's credit report to see if the O'Reilly's could purchase a home based solely on Mrs. O'Reilly's credit. They were denied credit.

101.    As of the date of filing of this matter, the O'Reillys have given up on purchasing a home.

102.    The act of placing this collection account on Mr. O'Reilly's credit report constitutes an attempt to collect a debt in violation of the FDCPA, including but not limited to 15 U.S.C. §§ 1692f,  and 1692e.

103.    The act of placing this collection account on Mr. O'Reilly's credit report constitutes an attempt to collect a debt in Connecticut without a license in violation of 36a C.G.S. §801.

104.    The act of placing this collection account on Mr. O'Reilly's credit report constituted unfair and deceptive conduct in connection with an attempt to collect a debt in violation of 36a C.G.S. §808 and the regulations promulgated thereunder.

105.    These violations of public policy as enunciated in 36a C.G.S. §801 and §808,

        constituted conduct prohibited by the Connecticut Unfair Trade Practices Act,

        42 C.G.S. §110 *et seq*.

## TRIAL BY JURY

106.    Plaintiffs are entitled to and hereby respectfully demand a trial by jury.  US

        Const. amend 7. Fed R. Civ. Pro. 38.

### *Respondeat Superior Liability*

107.    The acts and omissions of the individual collectors who communicated with

        Plaintiffs as more further described herein, were committed within the time and

        space limits of their agency relationship with their principal, Defendant NH/NE.

108.    The acts and omissions by these individual employees were incidental to, or of

        the same general nature as, the responsibilities these agents were authorized to

        perform by Defendant NH/NE in collecting consumer debts.

109.    By committing these acts and omissions against Plaintiff, these individual

        collectors were motivated to benefit their principal, Defendant NH/NE.

110.    Defendant NH/NE is therefore liable to Plaintiffs through the Doctrine of

        Respondeat Superior for the intentional and negligent acts, errors, and

        omissions done in violation of state and federal law by its collection

        employees, including but not limited to violations of the FDCPA and

        Connecticut law, in their attempts to collect this debt from Plaintiff.

## TRIAL BY JURY

111.    Plaintiffs are entitled to and hereby respectfully demand a trial by jury on all

        issues so triable.  US Const. amend. 7.  Fed.R.Civ.P. 38.

112.    As a result of the defendants' actions, the defendants are liable to the plaintiffs for damages, attorney's fees and costs.

## CAUSES OF ACTION

### COUNT I.

### VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT

### 15 U.S.C. §1692 *et seq*.

113.    Plaintiffs incorporate by reference all the above paragraphs of this Complaint as though fully stated herein.

114.    The foregoing acts and omissions of Defendants and their agents constitute numerous and multiple violations of the FDCPA including, but not limited to, each and every one of the above-cited provisions of the FDCPA, 15 U.S.C. § 1692 et seq., with respect to Plaintiffs.

115.    As a result of Defendants' violations of the FDCPA, Plaintiffs are entitled to actual damages pursuant to 15 U.S.C. § 1692k(a)(1); statutory damages in an amount up to $1,000.00 pursuant to 15 U.S.C. § 1692k(a)(2)(A); and, reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1692k(a)(3), from Defendants herein.

### COUNT II.

### VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT

### 42 C.G.S. §110 *et seq*.

116.    Plaintiffs incorporate by reference all the above paragraphs of this Complaint as though fully stated herein.

117.   Defendants have acted, as alleged herein, in the conduct of trade or commerce as defined in 42 C.G.S. §110a(4).

118.   Defendants' actions and practices, as outlined above, violate 15 U.S.C. §1692 *et seq*., 36a C.G.S. §801 and §808 and the regulations promulgated thereunder.

119.   As a direct and proximate result of Defendants' violation of the Connecticut Unfair Trade Practices Act, 42 C.G.S. §110b(a), Plaintiffs have suffered ascertainable losses under 42 C.G.S. §110g(a) in an amount to be proved at trial.

120.   Defendants are also liable, pursuant to 42 C.G.S. §110g(a), for punitive damages.

121.   Furthermore, Defendants are liable, pursuant to 42 C.G.S. §110g(d), for costs and reasonable attorneys' fees.

122.   In compliance with 42 C.G.S. §110g(c), a copy of this Complaint has been mailed to the Attorney General of the State of Connecticut and the Commissioner of the Connecticut Department of Consumer Protection.

## COUNT III

**INVASION OF PRIVACY BY INTRUSION UPON SECLUSION AND BY REVELATION OF PRIVATE FINANCIAL FACTS TO THIRD PARTY**

123.   Plaintiffs incorporate by reference all of the paragraphs of this Complaint as though fully stated herein.

124.   Congress explicitly recognized a consumer's inherent right to privacy in collection matters in passing the Fair Debt Collection Practices Act, when it stated as part of its findings:

> **Abusive debt collection practices contribute** to the number of
> personal bankruptcies, to marital instability, to the loss of jobs, and
> **to invasions of individual privacy.**
>
> 15 U.S.C. § 1692(a) (emphasis added).

125.   Congress further recognized a consumer's right to privacy in financial data in
passing the Gramm Leech Bliley Act, which regulates the privacy of
consumer financial data for a broad range of "financial institutions" including
debt collectors albeit without a private right of action, when it stated as part of
its purposes:

> It is the policy of the Congress that **each financial institution has an**
> **affirmative and continuing obligation to respect the privacy of its**
> **customers** and to protect the security and confidentiality of those
> customers' nonpublic personal information.
>
> 15 U.S.C. § 6801(a) (emphasis added).

126.   Defendants and/or their agents intentionally and/or negligently interfered,
physically or otherwise, with the solitude, seclusion and/or private concerns or
affairs of these Plaintiffs, namely, by unlawfully attempting to collect a debt
and thereby invaded each Plaintiff's privacy.

127.   Defendants also intentionally and/or negligently interfered, physically or
otherwise, with the solitude, seclusion and or private concerns or affairs of the
Plaintiff, namely, by unlawfully disclosing information about this debt to third
parties, and thereby invaded the Plaintiffs' right to financial privacy.

128.   Defendants and their agents intentionally and/or negligently caused emotional harm to each of these Plaintiffs by engaging in highly offensive conduct in the course of collecting this debt, thereby invading and intruding upon each of these Plaintiff's rights to privacy.

129.   Each Plaintiff had a reasonable expectation of privacy in Plaintiff's solitude, seclusion, private concerns or affairs, and private financial information.

130.   The conduct of these Defendants and their agents, in engaging in the above-described illegal collection conduct against these Plaintiffs, resulted in multiple intrusions and invasions of privacy by these Defendants which occurred in a way that would be highly offensive to a reasonable person in that position.

131.   As a result of such intrusions and invasions of privacy, each Plaintiff is entitled to actual damages in an amount to be determined at trial from each and every Defendant.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that judgment be entered against each and every Defendant:

### COUNT I.

### VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT

### 15 U.S.C. § 1692 et seq.

- for an award of actual damages pursuant to 15 U.S.C. § 1692k(a)(1) against Defendants and for Plaintiffs;

- for an award of statutory damages of $1,000.00 pursuant to 15 U.S.C. §1692k(a)(2)(A) against Defendants and for Plaintiffs;

Case 3:11-cv-00687-SRU   Document 1   Filed 04/29/11   Page 19 of 21

- for an award of costs of litigation and reasonable attorney's fees pursuant to 15 U.S.C. § 1692k(a)(3) against Defendants and for Plaintiffs; and

- for such other and further relief as may be just and proper.

## COUNT II.

## VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT

## 42 C.G.S. § 110 et seq.

- for an award of actual damages pursuant to 42 C.G.S. §110g(a) against Defendants and for Plaintiffs;

- for an award of punitive damages pursuant to 42 C.G.S. §110g(a) against Defendants and for Plaintiffs;

- for an award of costs of litigation and reasonable attorney's fees pursuant to 42 C.G.S. §110g(d) against Defendants and for Plaintiffs; and

- for such other and further relief as may be just and proper.

## COUNT III.

## INVASION OF PRIVACY BY INTRUSION UPON SECLUSION AND BY REVELATION OF PRIVATE FINANCIAL FACTS TO THIRD PARTY

- for an award of actual damages against Defendants and for Plaintiffs;

- for such other and further relief as may be just and proper.

Dated this the 28th day of April, 2011.

Respectfully Submitted— Sean Michael O'Reilly and Kelly Ann O'Reilly

BY:  /s/ George T. Holler
George T. Holler
Their attorney
31 Cherry Street, Suite 109
Milford, Connecticut 06460

Tel: (203) 301-4333
Fax: (203) 306-3113
CT 27371
georgeh@hollerlawfirm.com

## VERIFICATION OF COMPLAINT AND CERTIFICATION

STATE OF CONNECTICUT          )
                              ) ss:  MILFORD
COUNTY OF NEW HAVEN           )

Plaintiffs Sean M. O'Reilly and Kelly A. O'Reilly, having first been duly sworn and upon oath, depose and say as follows:

1. We are Plaintiffs in this civil proceeding.
2. We have read the above-entitled civil Complaint prepared by our attorneys and we believe that all of the facts contained in it are true, to the best of our knowledge, information and belief formed after reasonable inquiry.
3. We believe that this civil Complaint is well grounded in fact and warranted by existing law or by a good faith argument for the extension, modification, or reversal of existing law.
4. We believe that this civil Complaint is not interposed for any improper purpose, such as to harass any Defendant(s), cause unnecessary delay to any Defendant(s), or create a needless increase in the cost of litigation to any Defendant(s), named in the Complaint.
5. We have filed this civil Complaint in good faith and solely for the purposes set forth in it.
6. Each and every exhibit we have provided to our attorneys which has been attached to this Complaint is a true and correct copy of the original.
7. Except for clearly indicated redactions made by our attorneys where appropriate, we have not altered, changed, modified, or fabricated these exhibits, except that some of the attached exhibits may contain some of my own handwritten notations.

_____
Sean Michael O'Reilly

_____
Kelly Ann O'Reilly

Subscribed and sworn to before me, George T. Holler, this ___28___ day of April, 2011.

_____
George T. Holler
Commissioner of the Superior Court

21